IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:25-CR-234 (AMN) |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANJA SALAMACK, | ) | |
|     Defendant. | ) | |

**DEFENDANT ANJA SALAMACK'S SENTENCING MEMORANDUM
AND MOTION FOR DOWNWARD VARIANCE**

Pursuant to Title 18 U.S.C. § 3553(a), Federal Rule of Criminal Procedure 32, and Section 6A1.3 of the United States Sentencing Guidelines, Defendant, ANJA SALAMACK, by and through undersigned counsel, hereby submits this Sentencing Memorandum and Motion for Downward Variance.  For the reasons set forth below, Defendant requests the Court grant a downward variance to impose a sentence of twelve months home confinement followed by five years of supervised release as it is sufficient but not greater than necessary to achieve the goals of sentencing.

    **I.**    **Introduction**

Here, we ask how does this person who has lived a law-abiding life and consistently helped others in pain and times of need, find herself facing the imposition of a sentence for such a serious offense.  Through this pleading, we will not offer any excuses for the commission of the crime. But we will try to show the humanity and frailty of the person who committed it; and how the life she has lived healing others should not be dismissed when imposing a fair and just sentence.

Ms. Salamack accepts full responsibility for her actions. The fact that this case is the first time she has ever been arrested and her first conviction does not dull the gravity of the harm. She respectfully requests leniency as her conduct took place during an extremely difficult time in her

life. During the COVID pandemic, she was fleeing from an abusive relationship, all while trying to maintain her employment and provide continuity of care for her patients. The overall stress and weight of it all caused her to exercise terrible decision-making resulting in the commission of very serious crimes.

II.   **Summary of Applicable Reasons to Support a Downward Variance**

1.   Pursuant to 18 U.S.C. § 3553(a)(1), the history and characteristics of the defendant and the nature and circumstances of the offense support a downward variance. We ask the Court to apply the following reasons[1] to the determination for a variance and the sentence to be imposed:

   a)   Mental and Emotional Condition

   b)   <u>General Mitigation Factor:</u>
        Sentencing Guidelines Disproportionally Treat Prescribed Adderall as Comparable to Street-Level Methamphetamine

   c)   Charitable Service/Good Works

   d)   Age

   e)   Employment

   f)   Non-Violent Offender

   g)   Presentence Rehabilitation

   h)   Remorse

2.   Pursuant to 18 U.S.C. § 3553(a), we ask the Court to apply the following other reasons[2] to the determination for a variance and the sentence to be imposed:

   a)   Pre-Sentencing Full Payment of Restitution to Victim
        (18 U.S.C. § 3553(a)(7))

   b)   Acceptance of Responsibility

   c)   Early Plea Agreement

   d)   Waiver of Indictment

---

[1] See Statement of Reasons, AO 245 SOR.
[2] *Id*.

## II. Sentencing Guidelines

The parties agree on the following guidelines:

| | | |
|---|---|---|
| Base Offense Level (BOL): | U.S.S.G. §2D1.1(c)(5) | 30[3] |
| Abuse of Position of Trust: | U.S.S.G. §3B1.3 | +2 |
| Acceptance of Responsibility: | U.S.S.G. §3E1.1(a) | -2 |
| | U.S.S.G. §3E1.1(b) | -1 |
| Safety Valve: | U.S.S.G. §5C1.2 | -2 |
| Zero Point Offender: | U.S.S.G. §4C1.1(a) and (b) | -2 |
| **Adjusted Offense Level (AOL):** | | **25** |

Ms. Salamack has no criminal history, therefore resulting in zero points and a criminal history category of I. Thus, the advisory Guideline range is 57-71 months in custody.

For reasons discussed below, a sentence below the advisory guidelines is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

## III. History and Characteristics of the Defendant

Ms. Salamack is a 50-year-old woman who has never been convicted of an offense before today. PSR ¶¶ 55-57. She has never even been arrested. PSR ¶¶ 59-61. She was raised by her mother and step-father, with her mother working three jobs to raise her children. PSR ¶ 62. Despite the physical distance between Ms. Salamack and her mother, who resides in Denmark, the two have a good relationship. *Id*.

In 1997, Ms. Salamack obtained a visa and immigrated to the United States, eventually becoming a naturalized citizen around 2011. PSR ¶ 63. In 1997, Ms. Salamack was married to Robert Salamack, and they had four children together. PSR ¶ 65. For approximately ten years, Ms. Salamack was a stay-at-home mom. *Id.* She became a Nurse Practitioner by going through the

---

[3] Note: In calculating the grouping of offenses, the AOL for Counts 6 through 8 is 18, which is 9 or more levels less serious than the AOL for Counts 1 through 5. Therefore, the Guidelines for Counts 1 through 5 prevail. See U.S.S.G. § 3D1.4; PSR ¶¶ 47-50.

nursing program at Fulton Montgomery Community College, obtaining a Bachelors in nursing at Russell Sage, and eventually obtaining her Master's Degree from Sage College Nurse Practitioner Psych Program. PSR ¶ 71. She obtained nursing licenses in New York, Florida, and California. *Id.*

Since as early as 2009, Ms. Salamack worked as a nurse. PSR ¶ 72. Prior to that, she worked as a nurse aide, showing her commitment to taking care of others. *Id.* Ms. Salamack worked and studied, all while raising her four children. Up until the instant lapse of judgment, Ms. Salamack has always been a hard-working, educated, mother and contributed positively to the community. She firmly believes, if given the opportunity by this Court, she can again help the community going forward in some role other than nursing.

1. **Ms. Salamack has no criminal history.**

Ms. Salamack is a low-risk offender. She is a 50-year-old woman who has never been convicted of an offense before today. PSR ¶¶ 55-57. She has never been arrested. PSR ¶¶ 59-61. The crimes committed are non-violent. A long term of incarceration will only seek to institutionalize her, as opposed to rehabilitating her for her mistakes.

2. **Severe trauma and abuse around the time of the commission of the offense significantly impacted Ms. Salamack's decision-making.**

Ms. Salamack moved out of New York to escape her ex-husband and her ex-fiancé. PSR ¶ 20. From July 2016 to October 2021, her ex-husband subjected her to verbal and physical abuse. PSR ¶ 66. He choked her, broke her wrist, and threatened to kill her. *Id.* The abuse escalated during the COVID pandemic, beginning in 2020. *Id.* To escape from the abuse, Ms. Salamack moved frequently. *Id.* However, her ex continued to find and threaten her. *Id.* Today, Ms. Salamack still fears for her safety. *Id.*

Her frequent moves to escape the abuse caused Ms. Salamack to move to Florida. At the time she moved, she was not licensed as a Nurse Practitioner in the state. However, it was also during the COVID pandemic. In response to growing concerns over the spread of the virus, in

March 2020, the DEA temporarily permitted authorized prescribers of controlled substances, such as Ms. Salamack, to prescribe controlled substances via telehealth appointments. These temporary rules were extended multiple times with the current extension continuing through December 31, 2025.

Though certainly not an excuse for failing to conduct the proper research, Ms. Salamack believed she was permitted to continue to treat her patients pursuant to DEA's modified rules on telehealth. Additionally, Ms. Salamack personally contracted COVID four times, and has damage to her lungs. This further added to her fears of treating patients in person during the COVID pandemic, causing her to conduct telehealth appointments as opposed to in-person appointments. PSR ¶ 67.

The majority of Ms. Salamack's patients were long-standing patients with documented ADHD. Admittedly, a few patients slipped through the cracks. One patient's mother convinced Ms. Salamack she was obtaining the prescription for her daughter (who had been a legitimate patient of Ms. Salamack's), while another patient tricked her into believing he needed the medication when he didn't. Neither person should have received the prescriptions. If Ms. Salamack had been in her right mind, not distracted by the extreme stressors in her life, and at her usual office setting she may have picked up on the red flags from these individuals. Instead, she made poor decisions at a very stressful and chaotic time in her life.

### 3. Ms. Salamack's emotional support dogs substantially help her deal with her PTSD.

Ms. Salamack suffers from PTSD as a result of the abuse. PSR ¶ 68. To assist her with her PTSD, she has two adorable emotional support dogs who assist her. PSR ¶¶ 68-69.



One of her boys, Fendi, suffers from an eye condition and requires daily medication. He only has 5% of his eyesight. He also has a benign tumor that has to be monitored. Ms. Salamack is beside herself with grief over how her actions will affect her dogs, as she has nowhere for them to go if she is incarcerated and does not know how she will cope without them. Her biggest fear is that if she is forced to give them up to a shelter, the shelter will euthanize them, especially Fendi, given his medical conditions.

      **4.     The Sentencing Guidelines unfairly equate Adderall to street-level methamphetamine, therefore a downward variance is warranted.**

Adderall, a Schedule II controlled substance, is the combination of dextroamphetamine and amphetamine.[4]  It is used as part of a treatment program to control symptoms of attention deficit hyperactivity disorder (ADHD) and narcolepsy. *Id.* Adderall is a central nervous system stimulant. *Id.*  Under the Guidelines, because part of Adderall contains amphetamine, it is treated the same as methamphetamine. USSG § 2D1.1(c)(5); *See also,* PSR ¶ 35. However, this was not always the case. Prior to 2001, the Guidelines calculated cases involving amphetamine far less harshly than

---

[4] https://www.drugs.com/adderall.html

the present version. Up until that point, amphetamine was not even found on the Drug Quantity Table. Additionally, up until 2001, one gram of amphetamine was considered equal to 200 grams of marijuana. In 2000, Congress passed the Methamphetamine Proliferation Act of 2000, Pub. L. 106-310. Section 3611 enhanced punishments for amphetamine laboratory operators. Based on this, the Sentencing Commission enacted emergency amendments making cases involving amphetamine equal to all cases involving methamphetamine. The result, the punishment for amphetamine offenses was increased by a factor of ten, with one gram of the drug now converting to 2,000 grams of marijuana and created a new category of "actual" amphetamine which 1 gram equaled 20,000 grams of marijuana. This was one hundred times what it had been before. Some reasons for the amendment, according to the Sentencing Commission, were because amphetamine and methamphetamine "are produced by a similar method and are trafficked in a similar manner … [and] share similar methods of use…." This is simply not true.

Amphetamine that is part of the prescription drug Adderall is not produced in a similar manner as the methamphetamine coming out of a clandestine drug lab. Neither is it trafficked in a similar manner. Adderall has a legitimate medical use, which Ms. Salamack legally prescribed to many patients who legitimately needed the prescription medication. The two are not comparable and should not be punished the same. Nor does it appear from the Commission that their intention was to punish medical prescribers to the same degree as those engaged in the illegally trafficking of (actual) methamphetamine. Instead, it appears to be an unfortunate consequence of the Commissions' noble, but misguided, efforts to crack down on methamphetamine.

Here, the Guidelines disproportionately punish medical prescribers for issuing prescriptions for Adderall. One way to consider a more proportionate punishment is to consider the pre-2001 Guidelines which equated one gram of amphetamine with 200 grams of marijuana. Ms. Salamack admitted to the unlawful distribution of 127.05 grams of amphetamine (actual). PSR

¶ 35. Under the current guidelines, her base offense level is 30. Under the previous Guidelines, her base offense level would be 16 (127.05 grams of amphetamine X 200 grams = 25.410 kg converted drug weight). U.S.S.G. § 2D1.1(c)(12). That is a 14-level difference, only highlighting the disparity under the current guidelines in the treatment of Adderall.

Other courts in this Circuit agree, varying downward in cases involving Adderall. In *United States v. Kurochkin*, 2014 U.S. Dist. LEXIS 16427 (S.D.N.Y., Jan. 24, 2014), Defendant was charged with Distribution and Possession with Intent to Distribute Amphetamine, Alprazolam, and Zolpidem, Schedule II and IV controlled substances. Kurochkin met with a confidential source who purchased Adderall from him. The Court in Kurochkin varied downward significantly from the current Guidelines, finding that the Guidelines disproportionately punished Adderall. *Id.* at *14. As the Court in Kurochkin noted, "[t]he Commission's factual basis for the amendment is inapposite as it related to Adderall. Adderall is not 'produced by a similar method and [] trafficked in a similar manner" as methamphetamine." *Id*. at *13 (citing the Commission's Statement). The Court found that "[t]he Guidelines' determination [] that one gram of Adderall equates to 20 kilograms of marijuana produces a 'disproportionally harsh' sentencing guideline for Defendant, and does not property[sic] reflect §3553 considerations." *Id.* at *14. Instead, the Court used the pre-2001 Guidelines to determine the base offense level for the conduct related to Adderall. Though Kurochkin was not even a licensed prescriber and had prior convictions, the Court sentenced Kurochkin to 12 months' imprisonment, followed by three years' supervised release.

Likewise, two Eastern District of New York cases have similarly addressed sentencing for the possession or distribution of Adderall. See *United States v. Wiltshire*, 11 CR 164 (May 10, 2012); and *United States v. Gabriel*, 10 CR 588 (July 3, 2012). In Wiltshire, the defendant distributed 1031 Adderall pills, weighing 30.9 grams of pure amphetamine. Wiltshire faced a guideline range of 57-71 months, much like Ms. Salamack faces. However, the Court sentenced

her to time served, six months of home confinement and five years of supervised release. While Mr. Gabriel, charged with distribution of Adderall, was sentenced to time served and three years of supervised release.

All three New York cases highlight the Court's ability to vary downward in cases involving Adderall given the Guidelines disproportionately harsh punishment under the current Guidelines.

### 5. Ms. Salamack will suffer severe collateral consequences.

Ms. Salamack is facing additional collateral consequences that are severe. She has already surrendered her DEA registration and can never prescribe controlled substances. PSR ¶ 71. As a result of her conviction, she will lose her nursing license. After over fourteen years as a nurse, and eleven years as a nurse practitioner, she will be forced to find a new career. PSR ¶ 72. These collateral consequences are severe penalties for a first-time offender and should be taken into consideration in determining a sentence that is sufficient, but not greater than necessary.

### 6. This case can be distinguished from cases noted in the PSR where defendants received 30-month sentences.

According to the PSR, similarly situated defendants received around 30 months incarceration for offenses at an adjusted offense level of 25. However, Ms. Salamack's case can be distinguished. As noted above, the discrepancy between the pre-2001 Guidelines and the current Guidelines in the punishment for distribution of Adderall is "disproportionately harsh" and doesn't reflect the factors set out in § 3553(a). If the Court treats Ms. Salamack's case as other cases involving Adderall, such as the Courts in Kurochkin, Wiltshire, or Gabriel, a sentence closer to time served, probation, or 12 months incarceration would be appropriate.

Even considering Kurochkin, Wiltshire, and Gabriel, Ms. Salamack's history and characteristics are uniquely different. She is a hard-working mother, licensed Nurse Practitioner, who suffered severe trauma and abuse at the time of the offense, committed no other offenses, and

was instantly remorseful for her actions. She will lose her nursing career and be forced to find a new profession. The consequences for her actions are severe despite any term of incarceration.

IV.     **Conclusion**

Considering the 3553(a) factors discussed above, a downward variance of 14-levels is warranted. This results in an adjusted offense level of 11 and a guideline range of 8 to 14 months. Ms. Salamack respectfully requests this Court impose a sentence of twelve-months home confinement followed by five years of supervised release. Due to the extensive restitution that was paid, we request no fine be imposed. This sentence is sufficient, but not greater than necessary to punish Ms. Salamack for her actions, while taking into consideration her unique situation.[5]

                Respectfully submitted,

                CHAPMAN LAW GROUP

Dated: October 5, 2025                */s/ Jonathan Meltz*
                                          JONATHAN MELTZ
                                          Bar No. 706277
                                          701 Waterford Way, Suite 340
                                          Miami, FL 33126
                                          Phone: (305) 712-7177
                                          jmeltz@chapmanlawgroup.com

---

[5] Should the Court impose a term of imprisonment, we request a self-surrender date, so she can have time to find someone to care for her dogs. We believe the Government has no objection to this.